· **Valarie HUDSON and Cynthia Freeman, Plaintiffs,**

**v.**

**SOFT SHEEN PRODUCTS, INC. and Larry Allen, Defendants.**

**No. 94 c 0487.**

United States District Court, N.D. Illinois, Eastern Division.

Jan. 10, 1995.

---

Mary Stowell, Linda Debra Friedman, Leng, Stowell, Friedman & Vernon, Thomas Aquinas Daley, John Thomas Moran Law Offices, John Thomas Moran, Chicago, for plaintiffs.

Richard Burk Lapp, Ellen E. McLaughlin, Kenneth David Schwartz, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, for defendant Soft Sheen Products, Inc.

Alan Francis Curley, Cynthia H. Hyndman, Janice Nadler, Robinson, Curley & Clayton, P.C., Chicago, for defendant Larry Allen.

### MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Plaintiffs Valarie Hudson and Cynthia Freeman ("Plaintiffs") allege that, while they worked for Defendant Soft Sheen Products, Inc. ("Soft Sheen"), Defendant Larry Allen ("Allen"), a vice president of Soft Sheen, sexually harassed them. They bring two counts under Title VII and one count each under common law theories of negligent retention and battery. Allen moves for judgment on the pleadings concerning the Title VII counts. Soft Sheen and the Plaintiffs ("the Opponents") oppose the motion. For the reasons discussed below, we grant Allen's motion.

### I. Background

As a vice president of Soft Sheen, Allen was the Plaintiffs' supervisor, someone with the authority to alter the terms and conditions of their employment. While acting as their supervisor, he allegedly engaged in verbal and physical sexual harassment, including offering the Plaintiffs employment benefits in exchange for sexual favors. Eventually, after employees complained about Allen's conduct and the company conducted an internal investigation, Soft Sheen terminated his employment.

### II. Standard of Review

We may review Fed.R.Civ.P. 12(c) motions for judgment on the pleadings under the same standard as we review Fed.R.Civ.P. 12(b)(6) motions for dismissal for failure to state a claim. *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir.1993); *see Thomason v. Nachtrieb*, 888 F.2d 1202, 1204 (7th Cir.1989). "A party fails to state a claim ... only if [it] 'can prove no set of facts upon which relief may be granted.' We assume well-pleaded allegations are true and ... draw all reasonable inferences in the light most favorable to the plaintiff." *Bethlehem Steel Corp. v. Bush*, 918 F.2d 1323, 1326 (7th Cir.1990) (citation omitted).

### III. Discussion

#### A. Statutory Provisions

Title VII prohibits "employers" from discriminating against employees on the basis of their "race, color, religion, sex, or national origin ..." 42 U.S.C. § 2000e–2(a)(1). "The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees ... and any agent of such a person." 42 U.S.C. § 2000e(b).

Before the Civil Rights Act of 1991 ("the Amendments"), prevailing plaintiffs could receive injunctive relief and "affirmative ac-

tion" such as back pay. 42 U.S.C. § 2000e–5(g). After the Amendments, however, prevailing plaintiffs could receive additional remedies, most notably compensatory and punitive damages. 42 U.S.C. § 1981a(a)(1) and (b)(1) and (2). Still, Congress limited the scope of those new remedies:

> The sum of the amount of compensatory damages ... and punitive damages awarded under this section, shall not exceed, for each complaining party—
>
> (A) in the case of [an employer] who has more than 14 and fewer than 101 employees ..., $50,000;
>
> (B) in the case of [an employer] who has more than 100 and fewer than 201 employees ..., $100,000;
>
> (C) in the case of [an employer] who has more than 200 and fewer than 501 employees ..., $200,000;
>
> (D) in the case of [an employer] who has more than 500 employees ..., $300,000.

42 U.S.C. § 1981a(b)(3).

### B. Statutory Interpretation

Allen argues that the definition of "employer" excludes individuals in their individual capacity.[1] He relies on Weiss v. Coca–Cola Bottling Co., 772 F.Supp. 407 (N.D.Ill. 1991) (Duff, J.), in which we held that the "and any agent" language of § 2000e(b) merely incorporates respondeat superior into the statute, and "[a] person liable in [his] official capacity is liable only as a surrogate for the employer." Id. at 411. In other words, "[t]he relief granted is against the employer, not the individual employees whose actions would constitute a violation of the Act." Hangebrauck v. Deloitte & Touche, 1992 WL 348743, at *3 (N.D.Ill. Nov. 9, 1992) (Duff, J.), (interpreting Weiss). We believed that this was the "more reasonable view," particularly because "the damages available under Title VII are damages which an employer, not an individual, would generally provide—i.e. backpay, reinstatement, etc." Weiss, 772 F.Supp. at 411. Consequently, Allen argues that the Plaintiffs im-

properly sued him in his individual capacity, and we should grant his motion for judgment on the pleadings.

The Opponents argue that the Amendments undercut the reasoning and result in Weiss. They rely on authority such as Vakharia v. Swedish Covenant Hospital, 824 F.Supp. 769 (N.D.Ill.1993), in which the court stated that "if the amendments did apply, Judge Duff's argument would lose virtually all of its force, since the[y] allow for full compensatory ... as well as punitive damages." Id. at 785, n. 2; see § 1981a(a)(1) and (b)(1) and (2). In fact, in Hangebrauck, before we had occasion to focus of the issue, we also believed that our reasoning had lost force. 1992 WL 348743, at *3. With the force gone, the Opponents argue that our result in Weiss is overruled and that the definition of "employer" now includes individuals in their individual capacity. Consequently, they argue that the Plaintiffs properly sued Allen, and we should deny the motion for judgment on the pleadings.

This is our first opportunity to consider whether the reasoning and result in Weiss survive the Amendments. Undeniably, the Amendments allow for tort-style damages. Yet they contain a limitation on damages provision, § 1981a(b)(3), which directly ties the possible monetary awards to the size of the employer. As we see it, the issue is whether Congress gave with one hand and took with the other, meaning whether it allowed for individual liability through the tort-style damages provision, but then disallowed it through the limitation on damages provision. In our discussion below, we assume that Congress gave with the one hand and consider only whether it took with the other. Our consideration includes an analysis of the statutory scheme of § 1981a(b)(3) and an investigation of the legislative history of the Amendments.

#### 1. Plain Language

Allen urges us to adopt the Ninth Circuit's argument in Miller v. Maxwell's Int'l Inc.,

---

1. The Seventh Circuit has not ruled on whether Title VII excludes individual liability, and the district courts are split. See Jendusa v. Cancer Treatment Centers of America, Inc., 1994 WL

635113 (N.D.Ill. Nov. 4, 1994) (providing an exhaustive list of Northern District opinions on the issue of individual liability under the various anti-discrimination statutes).

991 F.2d 583 (9th Cir.1993), that "if Congress had envisioned individual liability under Title VII for compensatory and punitive damages, it would have included individuals in this litany of limitations and would have discontinued the exemption for small employers...." *Id.* at 588, n. 2. Courts in this District have found the argument in *Miller* persuasive. *Hamilton v. City of Chicago,* 1993 WL 535351, at *3 (N.D.Ill. Dec. 17, 1993); *Finley v. Rodman & Renshaw, Inc.,* 1993 WL 512608, at *2 (N.D.Ill. Dec. 8, 1993); *Pelech v. Klaff–Joss, LP,* 828 F.Supp. 525, 529 (N.D.Ill.1993).

On four grounds, however, the Opponents do not find the argument in *Miller* persuasive. First, they argue that it derived from "unique facts," appeared in "a footnote," and expressed only "dicta." Op.Br. at 4. These disparagements just imply that the argument may be suspect; they do not disprove it. For the disproof, we look to the Opponents' other grounds.

Second, they argue that, because the Amendments "prohibit[ ] judges from informing the jury about the damage caps[,] ... one could ... conclude that Congress *intended* [to create individual liability]." Op.Br. at 6–7; *see* 42 U.S.C. § 1981a(c)(2). Their premise does not support their conclusion. Moreover, regardless of what the jury knows, Congress did link the damages caps to employer size. § 1981a(b)(3). Should we role-play as an uninformed jury member when we interpret the statute? That cannot be wise. What if the parties did not request a jury trial and we had no cause to reach § 1981a(c)(2)? Could there be individual liability in jury trials but not in bench trials? That cannot be right. The Opponents' argument is unpersuasive.

Third, they argue that because Congress "knew how to exclude certain types of potential respondents" and yet did not exclude individuals, it "logically follows" that Congress intended to include individuals among those who may be liable. Op.Br. at 7; *see* 42 U.S.C. § 1981a(b)(1). This overbroad, circu-

lar argument has no more strength than it did before the Amendments, when it was impotent. *See* § 2000e(b); *see also, e.g., Tenn. Valley Authority v. Hill,* 437 U.S. 153, 188, 98 S.Ct. 2279, 2298, 57 L.Ed.2d 117 (1977) (following the maxim *expressio unius est exclusio alterius* ). Their argument is particularly unpersuasive given the legislative history of the Amendments, which we discuss below.

Fourth, the Opponents contend that "the 'logic' of the damage caps in the [Amendments] is simply explained by the fact of political compromise." Op.Br. at 7. Again, they advance an overbroad argument. All legislation is the product of political compromise. Moreover, the logic should be in the statute, not the unexplained compromise. *Sua sponte,* then, we attempt to find the logic. One could argue that supervisors at larger companies have more responsibility and, therefore, should assume greater exposure to liability. Or that supervisors at larger companies make more money and, therefore, should assume greater exposure. No doubt, there is a host of potentially material factors such as corporate transfers and foreign travel that may fluctuate with the size of a company. With a little imagination, and a lot of patience, it is possible to make arguments for all of them. It is possible, but it is also absurd.[2] The Opponents' plain language arguments are unpersuasive.

### 2. Broad Intent

Allen urges us to adopt the argument in *Miller* that individual liability under Title VII is unnecessary to effectuate Congress' broad intent to eradicate discrimination. 991 F.2d at 588. At least, he urges that there is insufficient "reason to stretch liability beyond the respondeat superior principle." *Id.*

The Opponents' argue that individual liability is, in fact, necessary to promote the broad intent of Title VII. They cite *Vakharia,* which stated:

Title VII always has served two purposes: to compensate the victims of discrimination

---

**2.** Moreover, if there were individual liability under § 1981a, Congress created an incentive structure for harassers to work for small companies, preferably those with under 15 employees.

We cannot imagine that Congress intended to inflict an inordinate number of harassers on small companies.

... and to deter discrimination in the future. To conclude that personal accountability of supervisory employees is unnecessary to reinstate victims or to award them their back pay is to neglect Title VII's broader goal of eradicating discrimination. 824 F.Supp. at 785 (citation omitted); *see Jendusa v. Cancer Treatment Centers of America, Inc.,* 1994 WL 635113, at *8 (N.D.Ill. Nov. 4, 1994) (considering the "broader remedial purposes and the importance of providing a meaningful deterrent").

It is unclear whether individual liability is necessary to eradicate discrimination. Those who claim that it is necessary must realize that individuals already face deterrents. For example, they risk the loss of employment status, defense fees, and social approval. On the other hand, those who claim that individual liability is unnecessary must realize that, despite the deterrents, individuals still discriminate. Is Title VII too young or too weak? That sounds like a question for the legislature, not the courts, to answer.

In any event, for our purposes, the answer to the question is irrelevant. Our analysis reveals that of the Amendments do not create individual liability. In light of that, we cannot reverse course in the face of some vague, aspirational broad intent. Congress had lofty goals but provided limited means for reaching those goals. Individual liability was not one of them. Therefore, the Opponents' broad intent argument is unpersuasive.

We conclude that, with some new extensions in the reasoning, *Weiss* is still good law. Because there is no individual liability under Title VII, the Plaintiffs can prove no set of facts upon which relief may be granted, and therefore, we grant Allen's motion for judgment on the pleadings.

## C. Legislative History

An investigation into the legislative history of the Amendments should be unnecessary; the statutory scheme is clear enough. Because our view about its clarity, however, differs from that of other district court judges, we proceed with the investigation. If our analysis above did not persuade, perhaps this will.

Although the Senate Committee on Labor and Human Resources produced no report on S. 102–1745, the enacted bill, it did produce one on S. 101–2104, the precursor to the enacted bill. In its report, the Majority announced that "the bill would allow compensatory damages ... where an unlawful employment practice is based on disparate impact." S.Rep. No. 315, 101st Cong., 2d Sess. at 55 (1990). Further, it announced that "punitive damages may also be assessed in such cases where the respondent ... engaged in the unlawful employment practice with malice, or with reckless of callous indifference." *Id.* The Majority did not mention individual liability under Title VII.

The Senate committee's Minority wrote an extensive, scathing response. It lamented that "compensatory and punitive remedies ... would ... dismiss a 25–year statutorily mandated practice of make-whole remedies under Title VII...." *Id.* at 95. Further, it lamented that the legislation would create a disincentive to conciliation and settlement. *Id.* at 96. Further still, it lamented that the "broad new Title VII remedies would impose a substantial increase on the costs of doing business in the global marketplace." *Id.* at 97. The Minority did not mention individual liability under Title VII.

The House of Representatives Committee on the Judiciary produced a report on H.R. 102–1, the enacted bill. In its section-by-section analysis, the Majority recounted the "[d]isturbing testimony" it heard during the course of its hearings on the insufficiency of the liability provisions under Title VII. H.R.Rep. No. 40, 102nd Cong., 1st Sess, pt. 2, at 25 (1991). The Majority concluded that, as written, Title VII "leaves victims of employment discrimination without remedies of any kind [for] their injuries and allows employers who intentionally discriminate to avoid any meaningful liability." *Id.* at 27. Through the Amendments, the Majority intended that "victims of intentional discrimination [would gain] the right to recover compensatory damages, and, in egregious cases, punitive damages as well." *Id.* at 3. The Majority did not mention individual liability under Title VII.

On the other hand, the *Jendusa* court wrote that the Majority mentioned individual liability indirectly. 1994 WL 635113, at *9. In the Majority's discussion of the insufficiency of the original Title VII liability provisions, it referred to the plight of several sexual harassment victims, including Carol Zabkowicz. H.R.Rep. No. 40, 102nd Cong., 1st Sess, pt. 1, at 67 (1991). The Majority also referred to Zabkowicz's unsatisfying lawsuit and the published opinion that followed it. *Id.*

According to the *Jendusa* court, "[t]hat opinion explicitly held that the corporate employer and its officers had violated Zabkowicz's rights under Title VII and entered a judgment awarding back pay 'against the corporate defendant and its officers.'" 1994 WL 635113, at *9 (quoting *Zabkowicz v. West Bend Co.*, 589 F.Supp. 780, 785 (E.D.Wis. 1984), *aff'd in part and rev'd in part on other grounds*, 789 F.2d 540 (7th Cir.1986)). Because the Majority referenced an opinion that upheld individual liability, "it is fair to conclude that Congress was fully aware of the practice of finding individuals ... liable." *Id.* Moreover, because Congress did not "directly" denounce the practice, it is also fair to conclude Congress "envision[ed]" and intended the practice to continue. *Id.*

With great respect, we are unable to agree with the *Jendusa* court. We are unable to agree with its interpretation of the holding in *Zabkowicz.* In *Zabkowicz,* the court upheld responsibility in an official capacity, not an individual capacity. To be sure, the court did not specify which capacity it intended, but, because it awarded back-pay, which is typically a remedy from employers, we believe it most likely that the court intended to uphold only responsibility in an official capacity. In doing so, the court upheld the commonplace.

In any event, we are unable to agree with the *Jendusa* court about the importance of the Majority's reference to *Zabkowicz.* It referred to that opinion to highlight the failure of the original Title VII liability provision to make Zabkowicz whole. *See* H.R.Rep. No. 40, pt. 1, at 67. It regretted that "the court was only able to award $2,763 in back pay for [Zabkowicz's] two-month absence from work during her pregnancy." *Id.* Apparently, the Majority regretted the paucity of the award, not the limited scope of the payees.

To some extent, committee reports are justifications for legislation. Committees often take the opportunity to dramatize a national ill and to explain why their legislation cures it. A committee would likely not express an important desire such as expanding Title VII liability by using an incorrect and veiled reference to a U.S. District Court opinion from Wisconsin. *See Zabkowicz,* 589 F.Supp. at 785. More likely, it would specifically dramatize the ill. For example, it might tell stories about sexual assaulting supervisors who retained their jobs. It might tell stories about such supervisors getting undeserved raises. Or about such supervisors living in the lap of luxury while their victims scrimped and saved and still could not get by. Here, the Majority told no such stories. The committee would also likely explain why its legislation cures the ill of non-liable supervisors. Again, here, the committee explained no such thing. Because the Majority neither indirectly nor meaningfully referred to individual liability in an individual capacity, respectfully, we disagree with the *Jendusa* court.

The House Minority echoed the sentiments of the Senate Minority and added to the list of complaints. They complained that the Amendments would lead employers to impose a de facto quota system in their employment practices. *Id.* at 68. Further, they complained that the new damages provisions would greatly and unnecessarily expand the number of employees bringing lawsuits. *Id.* at 71. Further still, they complained about the "[l]awyers' [b]onanza" from the expanded number of lawsuits. *Id.* at 72. The Minority did not mention individual liability under Title VII.

The Senators and Representatives carried the committee debate to the Floor, where they discussed the Amendments at length. *See* Congressional Information Service, *Legislative Histories of U.S. Public Laws* at 188–9 (1991). The Senators and Representatives did not mention individual liability under Title VII.

Based on this legislative history, we find that Congress made no reference to expanding Title VII liability to include individuals in their individual capacity. It is often difficult to draw conclusions from congressional silence. Was Congress silent because it considered the issue so far fetched? Or was it silent because it considered the issue so well settled? The conclusion could go either way.

We recognize the typical difficulty, but this is not a typical case. Federal courts interpreted the civil rights laws for decades before the Amendments. Congress must have been aware that the majority of jurisdictions interpreted those laws, or at least Title VII, to exclude individual liability. Given the noise of the federal courts, we do not believe that Congress expected to change the law with silence.

Moreover, the dissenters supplied exhaustive, thoughtful, and even caustic responses to the Amendments. On such issues as the cost of business, number of litigants, and remuneration of lawyers, they apparently thought of every conceivable negative outcome and shouted it from the rooftops. Their interests and tone lead us to believe that, had they considered individual liability a conceivable outcome, they would also have considered it a negative one and denounced it in a similar fashion. Yet they never mentioned it.

Therefore, the legislative history provides no basis for our reconsidering our conclusion that, with some new extensions in the reasoning, *Weiss* remains good law.

### IV. Conclusion

For the reasons discussed above, we grant Allen's motion for judgment on the pleadings. Exercising our discretion, however, we retain supplemental jurisdiction over Allen for the Plaintiffs' common law claim against him for battery.